CRAWFORD (SMITH v.). See Case No. 13,030.

CRAWFORD (UNITED STATES v.). See Case No. 14,890.

CRAWFORD (VAN CAMPBUSH v.). See Case No. 2,224.

---

## Case No. 3,372.

### CRAWFORD et al. v. The WILLIAM PENN.

[1 Pet. C. C. 106.][2]

Circuit Court, D. New Jersey. April Term, 1815.

ACTION BY ALIEN ENEMY.

1. The general rule of the common law of England is, that an alien enemy cannot maintain an action, in the courts of that country, in his own name, during the war.

2. A person beneficially interested in a suit, if alien enemy, cannot support a suit in the name of his trustee, who is not an alien.

3. It is otherwise, if the contract upon which suit is brought, arises out of a trade licensed by the government in whose courts redress is sought; and enemy interest, will not defeat such a suit.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Richard Peters, Jr., Esq.]

4. Quere, if such a suit can be maintained in the name of the alien?

5. The rules of the common law, in cases of alien enemy, do not apply in the same rigor, in courts acting under the general laws of nations.

[Cited in Taylor v. Carpenter, Case No. 13,-785.]

6. Nature, character, and privileges of a cartel vessel, and of the persons concerned in her navigation. All contracts made for equipping and fitting a cartel, are to be considered as contracts made between friends, and ought to be enforced in the tribunals having jurisdiction thereof.

This was a libel in the district court, on an hypothecation of this vessel, given at Jamaica, for repairs made on her, and advances for her outfit, to enable her to perform her voyage to the United States. The owner of the ship was admitted to claim; and he pleaded, that the instrument of hypothecation was executed during war; and that the libellants [Crawford and McClean] are alien enemies, residing in Jamaica. The replication stated, that the vessel was employed, by the United States, as a cartel, to bring to the United States, from Jamaica, a number of American prisoners; and having, as such, commenced her voyage, was compelled by stress of weather to put back to refit, and procure provisions; on which account these advances were made, and without which she would not have performed her voyage. To this replication, there was a demurrer and joinder by the libellants. The district court dismissed the libel, from which decision, the cause came by appeal to this court.

McIlvain & Stockton, for the appellants, contended: that alien enemy is not, per se, a bar to a suit, in cases where the reason of the rule, which produced the disability, has ceased; as, if the alien came into the country by license; or, being in the country at the breaking out of the war, is permitted to continue; or, in cases where the trade, on account of which the contract is made, is licensed; and, in this latter case, all the means necessary to effect the end so legitimated, are also protected. That a cartel, divests the vessel, and all parties connected with her, of their hostile character; so that not only are all contracts, made in relation to the service she is engaged in, lawful; but the parties are to be considered, pro hac vice, as friends; at all events, in a court of the law of nations. 11 Johns. 69, 117; 1 Comyn. 387; 3 Rob. Adm. & Pr. (Am. Ed.) 116; 4 C. Rob. Adm. 289; 5 C. Rob. Adm. 183; 6 C. Rob. Adm. 336; 1 C. Rob. Adm. 168; Bynk. 55; 13 East, 332; 1 Ld. Raym. 282; Salk. 42; 3 Burrows, 1734; Doug. 641; 8 Term R. 166; 8 East, 273; 15 East, 419.

Mr. Griffith, for the appellant, argued: that the validity of the contract, does not remove the legal disability of the party to sue; and, that in none of the cases cited, was the suit brought in the name of the alien enemy, unless he was commorant in England, or unless the war was over. The case from 2 Douglass, 641, was overruled in the exchequer chamber, as appears by a note in that book. Anthon v. Fisher, p. 649.

WASHINGTON, Circuit Justice. The general rule of the common law of England is, that an alien enemy cannot maintain an action in the courts of that country, during the war, in his own name. The rule is not founded upon any legal objection to the contract or other ground of the action, but, upon the disability of the party to sue; arising out of the hostile character which the war has impressed upon him. This rule appears to be inflexible, except where the alien enemy is under the protection of the king; as where he comes into the kingdom after the war, by license of the sovereign; or being there at the time of the war, is permitted to continue his domicil. Within the reason upon which the general rule was probably founded, it has been also decided, that, if the person beneficially interested in the subject in dispute, be an alien enemy, the action cannot be supported, even in the name of a British subject, his trustee, any more than it could have been in that of the alien enemy himself. Public policy, which forbids that the property sued for should be carried out of the country to enrich the enemy, would be violated equally in the one case as in the other. But where the reason ceases, upon which this doctrine is founded, which forbids the interest of an alien enemy to be asserted by his trustee, though a subject, the rule does not prevail; and therefore if the contract on which the suit is brought, arise directly or collaterally out of a trade licensed by the sovereign authority of the government, in whose courts redress is sought, enemy interest in the subject in controversy, will not defeat the action depending in the name of the subject as trustee. Thus, it has been held, that action upon an insurance made upon a licensed trade with the enemy for the use of an enemy, may be supported in the common law courts of England, in the name of the agent who effected the insurance, he being a British subject. For all the purposes of this trade, the person for whose benefit the license was granted, is to be regarded, virtually, as an adopted subject of Great Britain; and his trade under such license as British trade:—and, the end being licensed, the ordinary legitimate means of attaining that end, is considered as being also licensed. Usparicha v. Noble, 13 East, 332; Kensington v. Inglis, 8 East, 273, 15 East, 419.

It is clear, therefore, that wherever the trade with an enemy, and consequently a contract founded thereon, are rendered lawful by the license of the sovereign, the objection to the person of the plaintiff, on the ground of his being an alien enemy, is merely technical and stricti juris. Although the reason on which the rule was founded, does not exist in such a case, the court being

bound to support the beneficial interest of such licensed alien enemy; yet it does not appear that any judge of the common law courts of England, has thought himself at liberty to entertain such a suit, if brought in the name of the alien enemy. Yet I know of no case in which it has been decided, upon the point coming directly in judgment, that such an action could not be maintained. In the case of Cornu v. Blackburne, 2 Doug. 641, the action was supported in the name of the alien enemy upon a ransom bond; but no plea was put in to bar the right of the plaintiff to sue; and the cause was decided upon another point. In Anthon v. Fisher, 2 Doug. 649, it was laid down generally, that an alien enemy cannot, by the municipal laws of England, sue for the recovery of a right acquired by him in actual war; but the particular case in which that decision was given, was that of a ransom bond; and of course the decision of the court should be considered as applicable to such a case. But the case of a ransom bond, is very different from that of a contract arising out of a licensed trade. In the former, the hostile character of the obligee is in no respect removed; on the contrary, it is an act of hostility which gives rise to it. In the latter case, the hostile character of the party with whom the contract is made, does not attach either to him or to the contract. "He is to be regarded (in the words of Lord Ellenborough) virtually as an adopted subject of Great Britain, and his trade as British trade." If he is to be so considered, it would seem to follow, that all objection to a suit being maintained in the name of such adopted subject, would be at an end; as much so, as if the plaintiff were, at the time of bringing the suit, personally within the British dominions. It must, nevertheless, be acknowledged, that, in the case of Kensington v. Inglis, 8 East, 273, the court seemed to be of opinion, that, even in the case of a licensed trade, the suit cannot be maintained in the name of the alien enemy. But, as the suit was in the name of a subject, the opinion, as to this point, was not essential to the decision of the cause; and, of course, it ought not to rank higher than an obiter dictum.

This examination of the subject has been intended to show, that, in cases where the contract upon which the suit is brought, arises out of a licensed trade, an objection founded upon the disability of the nominal plaintiff to maintain the action, on the ground of alien enemy, is extremely feeble; and can only be supported by a tenacious adherence to a rigid rule of the common law, notwithstanding the reason of the rule, should, in this particular case, have ceased. The question then is, does this rule apply in all its rigour, to courts acting under the general law of nations, and proceeding according to the civil law? I think it does not. Bynkershoek (Bynk. 55) appears to be very strong upon this subject. He says, that

where commerce is permitted amongst enemies, contracts, and actions founded upon them, are permitted; "for who," he asks, "will sell and carry goods to an enemy, without the right of recovering the price of them? and what hope can there be of recovering that price, if one cannot judicially compel payment from his enemy purchaser." In cases of this nature, in courts proceeding according to the civil law, the only question is, has the plaintiff a persona standi in judicio? Can he be heard as a plaintiff in that court? Bynkershoek, in the above quotations, gives the answer. The right to sue, and to compel payment, is a necessary incident to his right to trade and to contract. This doctrine of Bynkershoek, has received the entire approbation of Sir William Scott, in the case of The Hoop, in which he gives the sense of that learned jurist as amounting to this, that the legality of commerce, and the mutual use of courts of justice, are inseparable. 1 C. Rob. Adm. 168.

The distinction which I am endeavouring to maintain, founded upon the peculiar rules which prevail in the courts of common law, and those proceeding by the rules of the civil law, may be illustrated by analogous cases of every day's practice. No rule is more rigidly adhered to by the common law courts of England, than that the assignee of a chose in action cannot maintain a suit in those courts, in his own name, upon common law principles. Neither can a cestui que trust bring an action in his own name; although, in both cases, the court will, for certain purposes, take notice of those equitable interests. But in a court of equity, where the strict rules of the common law courts do not obtain admission, the person having the beneficial interest, is admitted to sue, and to assert his right, in his own name. In like manner, and within the same principle, it would seem reasonable, that where the party is divested of his hostile character, by which he acquires a persona standi in judicio, the technical objection of the common law courts, to his being heard, as plaintiff, ought to be disregarded in courts which proceed by different rules. The only remaining question is, can a contract, made with an alien enemy, by the owner or master of a cartel vessel, in relation to the navigation of that vessel, upon the service in which she is engaged, be enforced in a court proceeding according to the rules of the civil law, and having jurisdiction of the subject matter? What is the character of a cartel vessel, and of the persons concerned in her navigation? The flag of truce which she carries, throws over her and them the mantle of peace. She is, pro hac vice, a neutral licensed vessel; and all persons concerned in her navigation, upon the particular service in which both belligerents have employed her, are neutral, in respect to both, and under the protection of both. She cannot carry on commerce under the protection of her flag, because this was

not the business for which she was employed, and for which the immunities of that flag were granted to her. She is engaged in a special service, to carry prisoners from one place to another; and, whilst so engaged, she is under the protection of both belligerents, in relation to every act necessarily connected with that service. It follows, that all contracts made for equipping and fitting her for this service, are to be considered as contracts made between friends, and consequently ought to be enforced in the tribunals of either belligerents, having jurisdiction of the subject. The agreement of the two nations, by their agents, to make her a cartel, amounts to a license by both, to perform the service in which she is employed, and sanctifies all the means necessary to that end.

Upon these principles, I am of opinion, that the libellants were capable of maintaining this suit; and that the plea of the claimants ought to be overruled. The proceedings have not been regular; but I shall not go further, after reversing the sentence below, than to direct the appellants to answer the libel.

[NOTE. The respondent filed a number of pleas, and, on argument on the pleas and replication, the court, at the request of the parties, granted leave to amend the pleadings. Case No. 3,373.]